2008 VT 32



Dept.
of Corrections v. Department of Corrections (2007-103)

 

2008
VT 32

 

[Filed
14-Mar-2008]

 

NOTICE:  This opinion is subject to motions for reargument under
V.R.A.P. 40 as well as formal revision before publication in the Vermont
Reports.  Readers are requested to notify the Reporter of Decisions, Vermont
Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801 of any errors
in order that corrections may be made before this opinion goes to press.

 


 2008 VT 32
 
  


 No. 2007-103
 
  


 Department of Corrections
 
 
 Supreme Court
 
 
  
 
 
  
 
 
  
 
 
 On Appeal from
 
 
      v.
 
 
 Washington Superior Court
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Matrix Health Systems, P.C.
 
 
 November Term, 2007
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Mary
 Miles Teachout, J.
 
 
  
 
 
 William
 H. Sorrell, Attorney General, and Bridget C. Asay, Assistant Attorney
 General, 
  
 Montpelier, for Plaintiff-Appellant.
 
  

Thomas
Z. Carlson of Langrock Sperry & Wool, LLP, Burlington, for
Defendant-Appellee.

 

 

PRESENT:  Reiber, C.J.,
Dooley, Johnson, Skoglund and Burgess, JJ.

 

 

¶ 1.      SKOGLUND, J.  The Department of Corrections
(DOC) appeals from the trial court’s order granting summary judgment to Matrix
Health Systems in this breach-of-contract dispute.  The court concluded that
the parties’ contract imposed no obligation upon Matrix to provide a specific
quantity of mental health services at prisons throughout the state as
consideration for its monthly fee.  The DOC argues that the trial court
misinterpreted the terms of the parties’ agreement.  We conclude that the
agreement is ambiguous, and we therefore reverse and remand for additional
proceedings. 

¶ 2.      The record indicates the following.  In June 2000,
the DOC entered into a two-year contract with Matrix for the provision of “personal
services generally on the subject of  inmate mental health services.” 
(Emphasis omitted.)  Matrix agreed to provide three categories of services,
consistent with the service descriptions and the “services provision matrix”
set forth in Attachment A of the contract.  These obligations included
administrative responsibilities, such as employing a Director of Psychiatry to
oversee the delivery of services for the entire mental health system, as well
as clinical responsibilities, which included the provision of “comprehensive
mental health services” at various prisons throughout the state. 

¶ 3.      As referenced above, Attachment A contained a “services
provision matrix,”  which identified nine state prison facilities and assigned
different types of mental health professionals to each facility.  The
assignments were represented by fractions of “full-time equivalents” (FTE). 
Thus, for example, the position of “Psychiatry-Supervisor” was assigned .05 FTE
at the Northwest State Correctional Facility, and .20 FTE statewide, for a
total of .25 FTE.  In a similar vein, a “Nurse Practitioner” was assigned to
each prison facility in various fractions of FTEs.  The matrix reflected nine
job categories, including an administrative category.  The contract stated that
the scope of services and the staffing matrix represented “specific
deliverables” for which Matrix was responsible.  

¶ 4.      Pursuant to the contract, Matrix agreed to invoice
the DOC on the first day of each month for the services provided during the
previous month, and Matrix assumed responsibility for ensuring that the
services described in Attachment A were delivered.  The contract provided that
if Matrix failed to deliver the staff resources described in the matrix, the
DOC would exercise non-compliance penalties.  Thus, it stated, if FTE staff
resources designated by site and discipline were not provided, the DOC would
withhold payment for the staffing deficiency.  During the first thirty days
that specific staff resources were not provided according to schedule, the
contract identified specific hourly rates for each position, which would serve
as the basis for deductions from the invoice.  These hourly rates doubled
during any subsequent month that specific staff resources were not provided
according to schedule.  In consideration for the services to be provided by
Matrix, the DOC agreed to pay Matrix $57,917 per month between June 2000 and
May 2001 and $59,365 per month between June 2001 and May 2002.

¶ 5.      The contract also included an attachment entitled “Customary
State Contract  Provisions.”  This attachment declared, among other things,
that the State would not provide any employee benefits, including vacation time
and sick leave, for Matrix employees.  It also required Matrix to maintain all
books, documents, payrolls, papers, accounting records and other evidence
pertaining to costs incurred under the agreement and to make them available for
inspection.  

¶ 6.      The parties amended their agreement several times. 
The first amendment,  effective May 31, 2002, extended the contract for another
year, and it modified the services provision matrix in Attachment A by changing
certain percentages of FTEs assigned to certain prison facilities.  The monthly
payment amount increased from $59,365 to $65,502 between June 2002 and May
2003.  The amendment also included the following statement:  “it is hereby
agreed and understood that this contract has no minimum amount.  The
Contractors’ services will be required on an ‘as needed’ basis.”  The agreement
was amended again in December 2002, changing certain FTEs and increasing the
payment to Matrix from $65,502 to $74,835.33 per month.  The agreement expired
on May 31, 2003.

¶ 7.      Approximately one year later, the State Auditor
released a report, finding that the DOC had failed to “(1) properly manage its
private mental health contracts; (2) follow bidding procedures; and (3) provide
adequate quality assurance for key mental health care services.”  The DOC then
hired an independent auditor to review the contract at issue here.  The auditor
assumed that the term “FTE” in the services provision matrix meant forty hours
of services per week, and after reviewing Matrix’s records, she concluded that
Matrix failed to provide approximately 8000 hours of services over the course
of the contract.  Based on the auditor’s findings, the State filed a
breach-of-contract action against Matrix.    

¶ 8.      Matrix moved for summary judgment, arguing that it
had not been obligated under the contract to provide any specific level of
services; rather, the parties had intended that Matrix would provide a flexible
set of services that would be monitored “qualitatively rather than
quantitatively.”  Matrix maintained that the DOC’s claim rested entirely on an
assumption that 1.0 FTE required 40 hours of service per week, yet this
definition was not found anywhere in the contract.  According to Matrix, the
DOC had invented a contractual obligation, and its audits purported to show
only that Matrix failed to comply with this fictional obligation. 

¶ 9.      The DOC opposed Matrix’s motion and filed a
cross-motion for summary judgment.  Pointing to specific language in the
contract, it argued that Matrix had been expressly obligated to provide a set
quantity of mental health services, which had been stated as fractions of a
full-time-equivalent worker in the services provision matrix.  The DOC
explained that these services had been identified as “specific deliverables”
and that the contract provided for liquidated damages for each hour of services
that Matrix failed to provide.  The DOC  acknowledged that the contract did not
define the term “FTE” but argued that the parties plainly intended FTE to mean
forty hours of services per week.  The DOC thus sought judgment in its favor
and an award of damages based on the independent auditor’s unchallenged
calculations.

¶ 10.    After a hearing, the trial court granted summary
judgment to Matrix.  It concluded that the contract was unambiguous, and that
it imposed no obligation on Matrix to provide any specific quantity of services,
measured in hours, as consideration for its fee.  Instead, the court explained,
the contract reflected the parties’ intent to create a comprehensive program of
mental health care for inmates through an active, functional, and adaptable
relationship.  It reasoned that fixing the exact number of hours that employees
would be present at each facility would conflict with the goal of providing
comprehensive and efficient services, and adapting the program to those needs
on an ongoing basis in a collaborative fashion.  Given this, the court
concluded, the FTE matrix could be interpreted only as a planning tool for
estimating clinical needs.  The court was unpersuaded that the contract’s
specific penalty provisions changed this result.  It thus granted summary
judgment to Matrix.  This appeal followed.

¶ 11.    We review the trial court’s decision using the same
standard as the trial court:  “[s]ummary judgment is appropriate only where the
depositions, pleadings, interrogatory answers, admissions and affidavits on
file show that no genuine issue of material fact exists and ‘any party is
entitled to a judgment as a matter of law.’ “  Mellin v. Flood Brook Union
Sch. Dist., 173 Vt. 202, 211, 790 A.2d 408, 417 (2001) (quoting V.R.C.P.
56(c)(3)).  We similarly review the trial court’s interpretation of the parties’
contract de novo.  See John A. Russell Corp. v. Bohlig, 170 Vt. 12, 16, 739 A.2d 1212, 1216 (1999) (question of whether contract is ambiguous presents
question of law, as does interpretation of unambiguous contract).  As discussed
below, we conclude that the parties’ agreement is ambiguous, and thus, its
proper interpretation presents a question of fact, not law.  See id.
(when ambiguity exists, interpretation of contract becomes question of fact to
be decided by a factfinder).  Because a material fact remains in dispute,
summary judgment was inappropriate.

¶ 12.    In construing a contract, the court seeks to
implement the parties’ intent.  In re Verderber, 173 Vt. 612, 615, 795
A.2d 1157, 1161 (2002) (mem.).  In doing so, we must consider the contract “as
a whole and give effect to every part contained therein to arrive at a
consistent, harmonious meaning, if possible.”  Main St. Landing, LLC v. Lake
St. Ass’n, 2006 VT 13, ¶ 7, 179 Vt. 583, 892 A.2d 931.  “[W]hen the
language of the contract is clear on its face, we will assume that the intent
of the parties is embedded in its terms.”  Verderber, 173 Vt. at 615, 795 A.2d at 1161.  An ambiguity exists, however, when “a writing in and of
itself supports a different interpretation from that which appears when it is
read in light of the surrounding circumstances, and both interpretations are
reasonable.”  Isbrandtsen v. N. Branch Corp., 150 Vt. 575, 579, 556 A.2d
81, 84 (1988).  As noted above, if an ambiguity exists, the question of what
the parties intended becomes a question of fact for the factfinder to resolve. 
Bohlig, 170 Vt. at 16, 739 A.2d at 1216.

¶ 13.    In this case, we cannot determine, as a matter of
law, if the parties intended that Matrix would be required to provide a
specific level of services as consideration for its monthly fee, or whether the
arrangement was essentially a “retainer” agreement, as Matrix argued.  Clearly,
the agreement reflects an intent to create a “collaborative” and comprehensive
mental health program at state prison facilities.  As the trial court noted,
the parties agreed to communicate regularly and consistently to discuss “general
system concerns and specific issues” that might arise during the term of the
contract.  The DOC also had the right to cancel the contract on short notice. 
Moreover, as the court pointed out, Matrix was charged with delivering services
consistent with both the more generally stated “service descriptions” found in
Attachment A as well as the “services provision matrix.”  

¶ 14.    Yet while these provisions might lend support to
Matrix’s position, the contract also includes very specific provisions that
support the DOC’s interpretation of the agreement.  As reflected above, Matrix
expressly agreed to provide services consistent with the staffing matrix, and
it agreed that the scope of services and the staffing matrix represented
specific deliverables for which it was responsible.  Matrix also agreed to
provide the DOC with an invoice each month for the services that were provided,
and the parties agreed that DOC was entitled to deductions from this invoice
based on hourly rates for specific staff resources that were not provided
according to schedule.  Moreover, the parties recognized that their agreement
had “no minimum” and that Matrix’s services were provided on an “as needed”
basis.  These provisions certainly tend to militate against a finding that
Matrix’s performance would be measured solely on a “qualitative” basis and that
Matrix would be entitled to a flat monthly fee regardless of the level of
services it provided.  Because the measure of Matrix’s performance is subject
to more than one reasonable interpretation, it was not appropriate for
resolution on summary judgment.  Toys, Inc. v. F.M. Burlington Co., 155 Vt. 44, 52, 582 A.2d 123, 127 (1990).

¶ 15.    We similarly cannot discern exactly how the penalty
provisions were intended to operate, or what the parties intended by the term “FTE.” 
Were the penalties to be implemented only when a mental-health position
remained vacant, as Matrix asserts, or was the DOC entitled to a deduction for
each hour of services (or fraction thereof) that were not provided in
accordance with the services provision matrix?  The plain language of the
agreement does not offer a definitive answer.  Additionally, while the State’s
interpretation of the term “FTE” to mean forty hours of services per week is
certainly reasonable, we cannot say, as a matter of law, that it is the only
reasonable interpretation of this term.  See Trs. of Net Realty Holding
Trust v. AVCO Fin. Servs. of Barre, Inc., 144 Vt. 243, 248, 476 A.2d 530,
533 (1984) (“A provision in a contract is ambiguous only to the extent that
reasonable people could differ as to its interpretation.”).  The fact that
employees of Matrix would not be treated as state employees, and thus, would
not be paid by the State for vacation or sick time, does not lead to the
inevitable conclusion that the parties intended the term “FTE” to mean a
forty-hour week.  

¶ 16.    We are unpersuaded that the extrinsic evidence
offered by Matrix clarifies these ambiguities.  As the DOC points out, this
evidence is disputed, with one of the signatories taking a directly contrary
position to that proffered by Matrix.  It remains for a factfinder to resolve
such conflicts and to determine the parties’ intent “based on all of the
evidence—not only the language of the written instrument, but also evidence
concerning its subject matter, its purpose at the time it was executed, and the
situations of the parties.”  Main St. Landing, 2006 VT 13, ¶ 7.  Summary
judgment was granted in error, and we therefore reverse and remand for
additional proceedings. 

            Reversed
and remanded.        

                                                                        FOR
THE COURT:                                        

 

                                                                        _________________________________

                                                                        Associate
Justice